

1325 AVENUE OF THE AMERICAS    212 980 7400 TEL
SUITE 2601                                              212 980 7499 FAX
NEW YORK, NY 10019                          ROBINSKAPLAN.COM

BRYAN J. VOGEL
212 980 7403 TEL
BVOGEL@ROBINSKAPLAN.COM

February 29, 2024
Honorable Katherine Polk Failla
United States District Judge
40 Foley Square, Room 2103
New York, NY 10007

*Via ECF and Email to*
*Failla_NYSDChambers@nysd.uscourts.gov*



Re: *Railware, Inc. v. National Railroad Passenger Corporation d/b/a Amtrak*; 1:22-cv-05013 (KPF); Railware's Response to Defendant's Letter Regarding AEO Access

Dear Judge Failla:

Railware is surprised and disappointed by Amtrak's letter, which demonstrates a lack of good faith in seeking to resolve the issues raised therein. Amtrak ambushed Railware by identifying Mr. William Herrmann and Ms. Keren Rabin for the first time in their letter brief (Dkt. 89 at 1-2) and by refusing to provide Railware any case law in support of its position, despite Railware repeatedly asking for such support. These tactics are not consistent with the Local Rules or Your Honor's Individual Rules of Practice. *See* Local Civ. R. 37.3; Individual R. of Practice 3(c). Amtrak has not met and conferred in good faith when it withheld crucial information about its position.

Amtrak's position has also shifted significantly over time. During the Case Management Conference, Amtrak's counsel told Your Honor that Amtrak's counsel wished to share "some" of Railware's AEO documents with Amtrak's in-house counsel. Tr. at 36:9-13. Only after several requests from Railware's counsel did Amtrak even identify what documents it was seeking to actually share. Now, instead of "some of these documents," Amtrak seeks an Order that Amtrak's in-house lawyers can see *all* of Railware's AEO documents. Dkt. 89 at 1. Amtrak's shifting-sands approach and improper premise for bringing this motion are sufficient basis to reject its request.

Setting aside Amtrak's failures, Amtrak also ignores the terms of the already agreed-to Interim Protective Order ("IPO") (Dkt. 67), which governs the parties' productions to-date. The parties negotiated, agreed to, and Magistrate Judge Cave entered, the IPO, which includes two confidentiality tiers: a CONFIDENTIAL tier, to which certain, identified in-house counsel could have access, and a HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY tier, to which in-house counsel do not have access. Dkt. 67, ¶7. The IPO also provides a process for resolving disputes regarding confidentiality designations. Dkt. 67, ¶6. Thus, any disputes regarding specific documents produced to-date should be resolved under the IPO. Amtrak now seeks a redo on the IPO, which does not make sense. A similar two-tier confidentiality system should likewise be entered by the Court to govern the remainder of this case. A proposed Protective Order is attached hereto as **Exhibit 1**. The same justifications for a two-tier system that Amtrak agreed to in the IPO apply equally here.

Amtrak's arguments also fail on the merits. Courts have "clear authority . . . to deny access to all [people] where the specific facts indicate a probability that confidentiality, under any form of

February 29, 2024
Page 2

protective order, would be seriously at risk." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1469 (Fed. Cir. 1984). "Thus, proper review of protective orders in cases such as this requires the district court to examine factually all the risks and safeguards surrounding inadvertent disclosure by *any* counsel, whether in-house or retained." *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (emphasis in original); *see also U.S. Steel,* 730 F.2d at 1468. Here, the facts show that the risk of disclosure by Amtrak's in-house counsel outweighs any alleged need.

**Amtrak's Identified In-House Counsel are Competitive Decisionmakers.** A substantial risk of improper disclosure may exist when counsel is engaged in "competitive decisionmaking," which means "a counsel's activities, association, and relationship with a client . . . are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel,* 730 F.2d at 1468 n. 3. Notably, litigation settlement and licensing are competitive decisionmaking. *Intel Corp. v. VIA Techs., Inc.,* 198 F.R.D. 525, 530 (N.D. Cal. 2000).

Here, all four of Amtrak's identified in-house counsel provide nearly identical, generic declarations with conclusory statements that they require access to Railware's AEO materials to "evaluate the case merits and any proposed settlement." *See* Amtrak Exs. 1, 2, and 4 at ¶4; Amtrak Ex. 3 at ¶5. Such boilerplate assertions have been found to be insufficient to demonstrate that one is not a competitive decisionmaker. *Intel*, 198 F.R.D. at 528. As in *Intel*, each of Amtrak's in-house counsel is involved in competitive decisionmaking because their "involvement in licensing through litigation . . . necessarily affect[s] licensing decisions." *See Intel,* 198 F.R.D. at 530; *see also,* ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, No. 6:07–cv–346, 2008 WL 5634214, at *5 (E.D.Tex. Mar. 14, 2008); *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, No. 5:03CV165(HGM/GLS), 2003 WL 1956214, at *5 (N.D.N.Y. Apr. 24, 2003). Here, as in any other patent litigation, any settlement reached between the parties will include a license to Railware's patents. Thus, Amtrak's in-house counsel are competitive decisionmakers.

Amtrak's cited cases do not support Amtrak and, in fact, support Railware. In *Barnes and Noble, Inc. v. LSI Corporation*, the court expressly rejected Barnes and Noble's "inappropriate[]" request to "allow[] its in-house counsel access to a broad swath of Defendants' AEO-designated material." No. C 11-02709, 2012 WL 601806, *6 (N.D. Cal. 2012). That is exactly what Amtrak seeks here. Similarly, in *Koninklijke Philips N.V. v. iGuzzini Lighting USA, Ltd.*, the court expressly excluded two of the identified in-house counsel from accessing any AEO material due to their involvement in licensing negotiations. 311 F.R.D. 80, 84 (S.D.N.Y. 2015). For similar reasons, the identified in-house counsel here should not be permitted to access AEO material. Finally, in *Rheault v. Halma Holdings Inc.*, the court addressed the "unusual" facts that the litigant was an individual that had sued in his own name, had no business associates or in-house counsel who could direct the litigation in his stead, was retired, and had no plans of returning work. None of those facts are present here. No. 23-700-WCB, 2023 WL 8878954, at *1 (D. Del. Dec. 22, 2023).

**Amtrak will Not be Prejudiced by Restricting Access to the CONFIDENTIAL tier.** Amtrak will suffer no prejudice for at least three reasons. *First*, Amtrak retained Venable LLP to represent it, a Vault 100 ranked law firm. To show prejudice, Amtrak must demonstrate that its ability to litigate this case will be hindered, but the hiring of competent outside counsel significantly reduces a party's claim of prejudice. *A. Hirsh, Inc. v. United States*, 657 F. Supp. 1297, 1305 (Ct. Int'l Trade 1987). Where, as here, a client has retained competent outside counsel, the prejudice to

February 29, 2024
Page 3

parties by restricting access to AEO documents is nonexistent or very low. *Brown Bag*, 960 F.2d at 1471. In *Brown Bag*, for example, no prejudice was found where outside counsel had sufficient time and resources to review confidential materials and was presumably competent to evaluate the information. *Id.*; *see also Intel*, 198 F.R.D. at 528.

*Second*, Amtrak's own actions demonstrate the lack of prejudice. Only Mr. Nilforoshan bothered to attend the parties' settlement conference. Judge Cave's Standing Order requires that "the person who attends the conference must be the person with ultimate responsibility for determining the amount of any settlement." Accordingly, at best, Mr. Nilforoshan is the only in-house counsel with any possible need to review Railware's confidential information.

*Third*, Railware has demonstrated its reasonableness to allow access to certain AEO documents when there is a demonstrated need. To date, Amtrak has identified just nine documents and two interrogatory responses that it sought to share with its in-house counsel. Railware has agreed to permit Mr. Bloom and Mr. Nilforoshan to review eight of those documents and the two interrogatory responses (including all of those referenced, and misrepresented, in the second and third bullet points on page 3 of Amtrak's Letter Brief (Dkt. 89)). With respect to RAILWARE0003995 (which Amtrak grossly mischaracterizes), Railware withheld consent due to the technical detail and trade secret nature of the document, and Amtrak never provided any explanation for why its in-house counsel needed access. Railware remains willing to confer with Amtrak where good cause exists to permit Amtrak's in-house counsel to review certain AEO information.

**The risks to Railware outweighs Amtrak's alleged need.** Amtrak repeatedly claims that Amtrak and Railware are not "competitors" and so there is no risk to Railware. Amtrak is taking that statement out of context. Railware's statement that they are "not competitors" was in the sense that Railware is not a railroad. But Amtrak entered a competitive relationship with Railware by copying Railware's technology, instead of obtaining it from Railware. Amtrak ***admits*** to copying Railware's technology as implemented for Railware's customer Metro North, stating "this project will implement the . . . Metro North Enhanced Employee Protection System (EEPS)" (Dkt. 11, §42) and that "[b]efore implementing EEPS, Amtrak visited with Metro North (or LIRR) once to discuss their EEPS." (Dkt. 40, ¶ 364). As a result of Amtrak's infringing actions, Railware has lost a potential customer in Amtrak and potentially others. Also, while it is true that Railware is not a railroad, Railware's customers are, and those customers (using Railware's technology) do indeed compete with Amtrak for ridership and the like. Additionally, Amtrak already tried to provide Railware's CONFIDENTIAL information to one technical business person when it attempted to add Aarti Bhardwaj, Amtrak's Senior Director of Train Control Systems, to the list of personnel with access to such information just four days before the settlement conference. Railware objected to this disclosure, but Amtrak's attempt belies its true intentions here: to gain unfettered access to Railware's trade secrets and confidential information, both technical and business-related. Given Amtrak's actions to date, Railware faces significant risk that Amtrak's in-house counsel will improperly disclose, advertently or inadvertently, Railware's highly confidential and trade secret information.

Accordingly, Railware respectfully requests that the Court deny Amtrak's motion and enter the Protective Order attached as **Exhibit 1**. Railware would like prompt entrance of a Protective Order, so that Amtrak cannot improperly use it as a basis to refuse to participate in discovery.

February 29, 2024
Page 4

                                         Respectfully submitted,

                                         */s/ Bryan J. Vogel*
                                         Bryan J. Vogel

cc:       Counsel for Amtrak

The Court is in receipt of (i) Amtrak's letter request for access for four Amtrak in-house attorneys to review any discovery Railware designates Highly Confidential – Attorneys' Eyes Only ("HCAEO") (Dkt. #88-89) and (ii) Railware's above response (Dkt. #91).  For the following reasons, the Court hereby GRANTS Amtrak's request and ORDERS Railware to permit access to such materials to the four named Amtrak attorneys, pending this Court's entry of a permanent protective order.

Principally, the Court does not believe that "as in *Intel*, each of Amtrak's in-house counsel is involved in competitive decisionmaking because their 'involvement in licensing through litigation ... necessarily affect[s] licensing decisions.'"  (Dkt. #91 at 2 (quoting *Intel Corp.* v. *VIA Techs., Inc.*, 198 F.R.D. 525, 530 (N.D. Cal. 2000))).  In *Intel*, the parties were direct competitors; each made money licensing (similar) technology to third parties.  *See, e.g.*, *id.* ("Ms. Fu's knowledge of technical aspects of VIA's products, VIA's licensing agreements, and marketing information would be directly relevant to her evaluation of licensing agreements of related products of Intel ... [which] may provide Intel a competitive advantage in negotiating related licenses in the future.").  Conversely, in the instant case, Amtrak and Railware are not competitors; namely, Amtrak does not earn revenue by licensing its technology to other railroads.  As such, Amtrak's in-house counsel's involvement in licensing through litigation cannot implicate "competitive decisionmaking."

Further, to the extent Railware competes with Amtrak for Amtrak's own business, Railware would appear to have already lost that competition.  As such, allowing Amtrak's in-house counsel access to the HCAEO materials does not pose a risk to Railware's competitive position.

Finally, the parties are ORDERED to jointly submit a proposed  protective order for the Court to so-order prior to the date set forth in the governing Civil Case Management Plan and Scheduling Order (Dkt. #84), which protective order will govern Amtrak's in-house counsel's review of the HCAEO materials going forward.

The Clerk of Court is directed to terminate the pending motions at docket entries 88 and 89.

Dated:     March 5, 2024           SO ORDERED.
           New York, New York

                                   HON. KATHERINE POLK FAILLA
                                   UNITED STATES DISTRICT JUDGE